UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

COVINGTON DIVISION

CASE NO. 2:24-CV-00051-DCR


ALEXANDER KALLMEYER                    PLAINTIFF

vs.

SAMUEL MATHEWS                         DEFENDANT



* * * * * * * *

DEPONENT:          SAMUEL MATHEWS

DATE:              NOVEMBER 7, 2024

* * * * * * * *



Tina M. Barlow, CCR

Certified Court Reporter



B   a   r   l   o   w
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky  41011
(859) 261-8440

Page 2

```
 1                    INDEX

 2                                          Page

 3   Cross-Examination by Mr. Blank          4

 4

 5

 6                 EXHIBIT INDEX

 7   Plaintiff's  1                          15

 8   Plaintiff's  2                          20

 9   Plaintiff's  3                          25

10   Plaintiff's  4                          39

11   Plaintiff's  5                          41

12   Plaintiff's  6                          48

13   Plaintiff's  7                          51

14   Plaintiff's  8                          51

15   Plaintiff's  9                          64

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1        The deposition of Samuel Mathews, taken for the
 2   purpose of discovery and/or use as evidence in the
 3   within action, pursuant to notice, heretofore taken
 4   at the office of Adams Law, PLLC, 40 West Pike
 5   Street, Covington, Kentucky, on November 7, 2024 at
 6   11:45 a.m., upon oral examination, and to be used in
 7   accordance with the Kentucky Rules of Federal
 8   Procedure.
 9                     * * * * * * * *
10                     APPEARANCES
11
12   REPRESENTING THE PLAINTIFF:
13   David M. Blank, Esq.
14   Paul J. Hill, Esq.
15
16   REPRESENTING THE DEFENDANT:
17   Jeffrey C. Mando, Esq.
18   Frank Shultz, Esq.
19
20                     * * * * * * * *
21
22
23
24
25
```

1           SAMUEL MATHEWS, after having been first

2   duly sworn, testified as follows:

3                   CROSS-EXAMINATION

4   BY MR. BLANK:

5       Q.   Good afternoon, Officer.  My name is David

6   Blank.  We briefly met as we walked in for Alex's

7   deposition.  I'm an attorney with Paul Hill, here,

8   and we're going to be asking you some questions on

9   the Kallmeyer vs. Samuel Mathews case.  You're aware

10  of that.  You've heard the instructions from Mr.

11  Mando to Alex, as far as the questions that I am

12  going to ask.  And I'm going to assume that you

13  understood the question if you give me an audible

14  answer and if you don't, you know to ask me to

15  rephrase it, correct?

16      A.   Yes, sir.

17      Q.   And you've had your deposition taken

18  before?

19      A.   Yes, sir.

20      Q.   Okay.  So you're aware of how this goes,

21  correct?

22      A.   Correct.

23      Q.   Okay.  How many times have you had your

24  deposition taken before?

25      A.   Once.

1      Q.    When was that?

2      A.    Approximately a year ago.

3      Q.    Who took it, do you know?

4      A.    I don't recall.

5      Q.    Do you know what the case was?

6      A.    I do.

7      Q.    What was it?

8      A.    Camarco was the plaintiff.  I think it was

9  against the City of Covington.

10     Q.    Okay.  Was that -- is that an abuse of

11 force case, a use of force case?

12     A.    Yes, sir.

13     Q.    Is that case still going on, as far as you

14 know?

15     A.    I believe so.

16     Q.    Are you still a defendant in that one, or

17 have you been dropped from that one?

18     A.    I'm still a defendant.

19     Q.    Okay.  You do live in the city of

20 Covington, or what city do you live in?

21     A.    I live in Union.

22     Q.    Union.  Can you just kind of go through

23 your education prior to any kind of law enforcement

24 education?  Start with high school.

25     A.    I graduated from Beechwood High School

Page 6

1   then I went to Morehead State University and got a

2   degree in education.

3        Q.   What year did you graduate from Beechwood?

4        A.   '11.

5        Q.   2011.  Okay.  What year did you graduate

6   from college, Morehead?

7        A.   I can't recall.

8        Q.   Okay.  Did it take you about four or five

9   years?

10       A.   Yes, sir.

11       Q.   Okay.  And employment-wise, before, again

12  before law enforcement, can you kind of just go

13  through that briefly with me?

14       A.   Yes, sir.  Starting off, I was a busser at

15  Greyhound Tavern.

16       Q.   All right.

17       A.   I worked for Five Seasons in the kitchen

18  area for a little bit.  I worked for Cincinnati

19  Floor Company.

20       Q.   Cincinnati Floor?

21       A.   Yes, sir.

22       Q.   Okay.

23       A.   And then I was a substitute teacher for

24  Kenton County School District.  And then I

25  dispatched for Boone County 911.  And then I became

1    a police officer for Covington.

2         Q.    Okay.  Prior to the October 7th/8th

3    incident, did you know who Alex Kallmeyer was?  Did

4    you ever run across him at Five Seasons or any of

5    these restaurants or anything like that?

6         A.    No, sir.

7         Q.    Do you know any of his family members?

8         A.    No, sir.

9         Q.    Okay.  How long have you been employed

10   with the -- as a police officer?

11        A.    Seven years.

12        Q.    And go ahead and go through with me any

13   different departments?  Did you just start with the

14   City of Covington?

15        A.    Yes, sir.

16        Q.    Okay.  And then go through any positions

17   that you had, where you started and where you are

18   today?

19        A.    I've carried several.  I've been a

20   field-training officer, trained new people.  I've

21   been part of our narcotics unit, bike patrol, SWAT

22   team and K9.

23        Q.    Okay.  Is patrol, is that a certain

24   designation?

25        A.    Yes, sir.

1    Q.    Okay.  And what are you doing today?  What

2    position are you in today, all of these?

3    A.    I'm a patrolman, and I specialize as a K9

4    unit.

5    Q.    How long have you been doing the K9?

6    A.    About a year.

7    Q.    Did you go to the police academy then?

8    A.    I did.

9    Q.    Okay.  And when did you go there?

10    A.    I can't remember the dates.

11    Q.    Yeah.  How long of a program was it for

12    you?

13    A.    23 weeks when I went.

14    Q.    It would have been after Morehead?

15    A.    Yes, sir.

16    Q.    What additional ongoing training have you

17    had since joining the force in Covington?

18    A.    I've taken a yearly in-service through the

19    Department of Criminal Justice training.  I've been

20    to field-training officer school in New Jersey.

21    I've had hundreds of hours of K9 training.  And I'm

22    certified through NAPWDA, which is a North American

23    Police Working Dog Association.

24    Q.    Okay.

25    A.    I've been trained on Lidar, which is

1    radar.  Probably several other things that I'm

2    forgetting.

3         Q.    Right.  And we've got your employment

4    file, so most of what you've done is contained in

5    that employment file?

6         A.    Yes, sir.

7         Q.    Have you had any specialized training

8    related to use of force?

9         A.    No, sir.

10        Q.    Any specialized training or education on

11   de-escalation tactics?

12        A.    Can you rephrase specialized?  Are we

13   talking about any training or --

14        Q.    Well, why don't we just go with any

15   training.

16        A.    Absolutely.  For both that and the use of

17   force as part of our 23 weeks at Richmond.  When I

18   took field -- when I was on field training, I was

19   training for my field-training officers.  And then

20   we do pretty frequent updates on policy and use of

21   force guidelines.

22        Q.    And those are the policy and use of force

23   guidelines from the City of Covington?

24        A.    The Covington Police Department.

25        Q.    Covington Police Department.  And any

Page 10

1    other documentation, educational materials other

2    than from Covington?

3        A.   No, sir.

4        Q.   Okay.  When you become a police officer, I

5    saw in what was provided, you take an oath to

6    support the Constitution of the United States,

7    correct?

8        A.   Correct.

9        Q.   Okay.  And in that oath you pledged to

10   abide by the Fourth Amendment protections against

11   police violence and excessive force?

12       A.   Correct.

13       Q.   Correct?  Okay.  Do you understand that

14   the Fourth Amendment safeguards citizens from

15   unreasonable searches and seizures which include

16   protections against unreasonable use of force by law

17   enforcement officers?

18       A.   Yes, sir.

19       Q.   When you decide to use force or not to use

20   force, what are you taking into consideration -- and

21   this is a loaded question, I guess, there's a lot to

22   it maybe, but you can bring me through it.  What are

23   you taking -- what do you consider -- what are the

24   factors that you consider in your decision to take

25   or not to take force against a defendant?

Page 11

 1       A.   Like you said, there's a lot of factors

 2   that go into it and what type of force to use.  But

 3   I try to do what's reasonable and necessary and to

 4   use the least amount of force necessary to effect an

 5   arrest.

 6       Q.   Okay.  So you're considering the severity

 7   of the crime?

 8       A.   Yes, sir.

 9       Q.   Okay.  You're considering whether the

10   suspect poses an immediate threat?

11       A.   Yes, sir.

12       Q.   And you're considering whether the suspect

13   is resisting arrest or attempting to flee?

14       A.   Yes, sir.

15       Q.   Are those the three main factors that

16   you're considering when you're deciding whether or

17   not to use force?

18       A.   Yes, sir.

19       Q.   Okay.  With regard to Mr. Kallmeyer's

20   offense, on a scale of one to ten when you first

21   stopped him, what was the severity of the crime in

22   your opinion?

23       A.   It was unknown, totally.  But I knew that

24   he was intoxicated shortly after getting out with

25   him, and that could be a lower risk.  But also there

Page 12

1    was the altercation, too, so I don't know what led

2    up to that.  That's why I kind of had to investigate

3    it.

4         Q.   You didn't see him involved in an

5    altercation?

6         A.   No, sir.

7         Q.   Okay.  You just suspected he might have

8    been?

9         A.   Yes, sir.

10        Q.   Okay.  And whether the suspect posed an

11   immediate threat, did you perceive him as posing an

12   immediate threat?

13        A.   Yes.

14        Q.   And what was that threat?

15        A.   With him not listening to any of my

16   commands, he could have -- I mean, forced me to go

17   hands on with him.  That gets dangerous very

18   quickly.

19        Q.   So he was an immediate threat because he

20   wasn't listening to your commands?

21        A.   Partially, yes, sir.  He kept putting his

22   hands in his pocket.  I don't know if he was going

23   to produce a weapon or not.  He's walking away from

24   me.  I needed to shut it down.

25        Q.   Okay.  And he was not -- before you put

Page 13

1   your hands on him, he wasn't resisting arrest,

2   right?

3       A.   I believe he was.

4       Q.   How was he doing that?

5       A.   When I told him he was under arrest, he

6   said, no, I'm not and started walking away.

7       Q.   Okay.  We'll get into that.

8            I saw in your employment file in September

9   2020 is when you became -- on the power bike unit?

10      A.   Yes, sir.

11      Q.   Okay.  And that was before you were within

12  the police force for three years; is that right?  So

13  was that about two and half years in?

14      A.   I believe so.

15      Q.   Okay.  And then on the SWAT team, you also

16  applied and were accepted as a SWAT officer, as

17  well?

18      A.   Yes, sir.

19      Q.   And that was before three years, as well,

20  correct?

21      A.   Correct.

22      Q.   Are there guidelines that require you to

23  be there for three years before you can apply to

24  the SWAT team?  Or is there some kind of indication

25  about three years before you can be on the SWAT

Page 14

1    team?

2        A.    Typically, they want three years of

3    service before you get a specialty position.

4        Q.    Okay.  But they made an exception for you?

5        A.    Yes, sir.

6        Q.    Okay.  And then in October of 2023 was the

7    K9, you became a K9 handler; is that correct?

8        A.    Yes, sir.

9        Q.    Does the force keep statistics on the

10   number of arrests and the number of abuse of -- use

11   of force cases that you've have been involved in?

12       A.    I'm not sure.

13       Q.    Is that ever made aware to you?  Do they

14   ever bring those statistics to you, or discuss those

15   statistics with you?

16       A.    They have once with me.

17       Q.    Okay.

18       A.    My arrest statistics.

19       Q.    When did they bring that to your

20   attention?

21       A.    I can't recall.  It's probably two years

22   ago.

23       Q.    Do you think that you make more arrests or

24   about the average amount of arrests as other

25   officers with the City of Covington?

Page 15

1       A.    Depends on what year we're talking about.

2       Q.    Let's talk about '22, '23?

3       A.    I'm probably on the upper end.

4       Q.    You're on the upper end?

5       A.    Yes, sir.

6       Q.    Are you on the upper end in 2022?  Are you

7    the top?

8       A.    I'm not sure.

9       Q.    Okay.  And what about 2023, would it be

10   pretty similar to 2022, probably, or not?

11      A.    Yes, sir.

12      Q.    More, or do you know?

13      A.    I'm not sure.

14            MR. BLANK:  Okay.  Let's mark as

15      Exhibit 1 Employee Performance Review.

16   (PLAINTIFF'S EXHIBIT 1 WAS MARKED FOR THE RECORD)

17      Q.    So in the work quality it says, Specialist

18   Mathews made the most arrests in the department in

19   each of the last several years, and by a wide

20   margin.  Do you see that?  Do they review this with

21   you?

22      A.    Are you at the top or the bottom?

23      Q.    No, at the bottom.  I'm sorry.

24      A.    Down here?

25      Q.    Yeah, work quality.

Page 16

1       A.   Yeah, our supervisors will go over these
2    with us.
3       Q.   Okay.  Was that a -- is that seen as a
4    positive thing that you make more arrests than other
5    officers?  I mean, is that a commendation kind of to
6    you?
7       A.   I don't know if it's necessarily a
8    positive or a negative.
9       Q.   Okay.  So you wrote 392 arrest citations
10   in the year 2022.  Do you remember having that
11   discussion with them?
12      A.   I don't recall.
13      Q.   Okay.  How many days did you work a week
14   back in 2022?
15      A.   At the time, it would have been four or
16   five because of the way our shifts rotate.
17      Q.   Four or five days a week?
18      A.   Yes, sir.
19      Q.   And so in that year it says you wrote 392
20   arrests.  And it says, which is more than the
21   departmental total of many surrounding police
22   agencies.  Do you know what they're talking about
23   there?
24      A.   Yes, sir.
25      Q.   Tell me about that.

Page 17

1        A.    They mean that my arrests only were more

2    than some of the smaller agencies around us.

3        Q.    Like what agencies are we talking about?

4        A.    I'm not sure specifically.

5        Q.    Some other local cities?

6        A.    Yes, sir.

7        Q.    Okay.  I received, I guess, it was in your

8    employment file, use of force reports that you've

9    been involved with.  And I counted -- I received

10   them for a 19-month period.  But they ended some

11   time in 2023.  Do you know -- have you not been

12   involved in any use of force reports since June of

13   2023?

14       A.    I have been.

15       Q.    Okay.  Has it been pretty constant of what

16   it was in 2022?  Have they increased?  Have they

17   decreased?

18       A.    I'm not sure.

19            MR. BLANK:  Okay.  We can go off the

20       record for a second.

21                (OFF THE RECORD)

22   BY MR. BLANK:

23       Q.    So I counted in the 19-month period there

24   were 19 use of force reports.  Are you -- do you

25   still kind of average about one a month?

Page 18

1      A.   I'm not sure, sir.

2      Q.   Okay.

3      A.   Yeah.  Sorry.  I couldn't tell you.

4      Q.   In your mind it's not significantly less

5  or significantly more than what it was in 2022?

6      A.   Correct.

7      Q.   And you don't know if Covington keeps

8  track of those use of force incidents or not?

9      A.   I'm not aware.

10      Q.   Okay.  How tall are you?

11      A.   Six foot.

12      Q.   And how much do you weigh?

13      A.   200-pounds.

14      Q.   And your arms are pretty big, I can tell

15  you that.  Do you work out --

16      A.   I do.

17      Q.   -- quite a bit?  Where do you work out at?

18      A.   My house.

19      Q.   Okay.  How much can you lift?

20      A.   For which lift?

21      Q.   Bench press.  I'm sorry.

22      A.   About 300 pounds.

23      Q.   How much do you work out with?

24      A.   Can you rephrase the question?

25      Q.   Well, I mean, so I can, at one time I can

Page 19

1    probably lift about 110 pounds.  But I can work out

2    with like 50.  I mean, what do you work out with is

3    what I guess I'm asking.

4         A.    Usually 200.

5         Q.    200?

6         A.    Around 200.

7         Q.    And then you lift it about how many times?

8         A.    Between five and eight.

9         Q.    Okay.

10             MR. HILL:  Is that all?

11        Q.    Okay.  And I saw you received a Physical

12   Fitness Excellence Award for running, push-ups,

13   bench press.  What is that award?  What was that?

14   Does everybody get that, or just certain people?

15        A.    When did I receive that, sir?

16        Q.    Physical Fitness Award, I can't tell you

17   exactly when you received it.

18        A.    I believe it's from the DSEJT and there's

19   certain standards and awards you get if you can -- I

20   don't remember the percentiles, but if you can hit a

21   certain percentile for certain workouts during your

22   final workout you can get a physical fitness award.

23        Q.    Okay.  With regard to addressing a citizen

24   on the street that is not cooperating with you and

25   your decision to use force, do you also consider

Page 20

1    that person's physique and what he looks like versus

2    how you're going to be able to confront him?  Is

3    that a consideration for you?

4        A.    Yes, sir.

5        Q.    Okay.  Why is that?

6        A.    Body size disparity means something.  You

7    can never, you know, you got to take it with a grain

8    of salt, though, also because I have coworkers that

9    are 130 pounds that could tie me into a pretzel.

10   But, you know, if you're dealing with a 90-year-old

11   female that's not being cooperative versus a

12   300-pound guy who goes to the gym every day, you'd

13   probably handle it a little differently.

14       Q.    And Alex versus you, were you physically

15   threatened by his appearance?  I mean, were you

16   concerned with his appearance at all?

17       A.    Not by his appearance.

18       Q.    Okay.  You didn't know if he had a weapon

19   though, right?

20       A.    Correct.

21           MR. BLANK:  I'm going to hand you Exhibit

22   2.

23   (PLAINTIFF'S EXHIBIT 2 WAS MARKED FOR THE RECORD)

24       A.    Thank you.

25       Q.    Can you identify that document for the

Page 21

1    record?

2         A.    General Order 4.1.

3         Q.    And this is with regard to arrests,

4    correct?

5         A.    Correct.

6         Q.    And on the second page, I'm sorry, on

7    the -- let's see here.  Well, the document talks

8    about that officers have discretion with regard to

9    making arrests or writing citations; is that

10   accurate?

11        A.    Yes, sir.

12        Q.    Is there discretion with regard to

13   somebody that you suspect as being intoxicated,

14   whether you can -- do you have to arrest them, or

15   could you cite them to court, or could you tell them

16   to go home?  Do you do have discretion with that, or

17   are there requirements?

18        A.    No, you have discretion.

19        Q.    Okay.  And are there fundamental

20   principles that you're trained in how to make that

21   decision?

22        A.    Can you rephrase that?

23        Q.    Well, what factors are you considering

24   when you decide I'm going to arrest this guy, or I'm

25   going to cite him to court, or I'm going to let

Page 22

1    him -- I'm going to tell him to go home?

2        A.   Regarding the alcohol intoxication, it's

3    not something you would cite for.  You either try to

4    work out a go home, or make an arrest on it.

5        Q.   Okay.

6        A.   And sometimes the location, how

7    cooperative the person is.  If you make contact with

8    somebody that's intoxicated and they're like, man,

9    I'm on the street in front of my house.  I'm going

10   to go inside and go to bed, that might be somewhere

11   where you'd use discretion, to just let them go back

12   in their house.

13       Q.   Have you ever taken somebody home that was

14   intoxicated?  Drove them home?  Does that happen

15   from time to time?

16           MR. MANDO:  While on duty?

17           MR. BLANK:  Yeah.

18       A.   I don't think so.

19       Q.   Okay.  You've not done it before?

20       A.   I don't believe so.

21       Q.   Okay.  With regard to arrests, you know,

22   when I'm watching it on TV there's always a way that

23   an officer -- on all these videos that I've seen

24   over and over again, there's always kind of a

25   procedure of how an officer arrests someone.  Is

Page 23

1   there training with regard to if you're confronted

2   with an individual that you're going to arrest,

3   exactly how you do that?

4        A.   I don't think there's a single way to do

5   it.  You know, from our training, and field

6   training, we have multiple options and take

7   everything into account and try to do it the safest

8   way for everybody.

9        Q.   So when you say there are multiple

10  options, what is the training if you're confronted

11  with somebody that you're going to arrest?  Do you

12  let them know that you're going to arrest them?

13       A.   I try to, yes, sir.

14       Q.   And how do you do that?

15       A.   By telling them they're under arrest.

16       Q.   And, I mean, do you get yourself in --

17  because somebody might react to that, right?

18       A.   Uh-huh.

19       Q.   Do you get yourself in a position that you

20  can take care of the situation, or you just stay

21  back from them, or does it all depend?

22       A.   It all depends.

23       Q.   Okay.  What's it depend on?

24       A.   Where you're at, number of civilians that

25  are around you, what their arrest is for, how

Page 24

1   co-operative the person is being.  I'm sure there's

2   numerous other factors.

3        Q.   Okay.  Do you get your handcuffs out as

4   you say it, or does it all just depend?

5        A.   It would be officer dependent.

6        Q.   So on an A1 arrest like this, what would

7   be the general training of how you're going to

8   arrest somebody?  Just like in the Kallmeyer

9   situation.

10        A.   Ideally, wait for a second officer so that

11   there's more control.  Each officer would grab an

12   arm, and then one would apply handcuffs.

13        Q.   Okay.  So simultaneously with saying

14   you're under arrest, you're usually putting a hand

15   on that person to let them know, correct?

16        A.   Not always simultaneously, but within a

17   close time.

18        Q.   Okay.  You didn't do that in this case?

19             MR. MANDO:  Objection.  Asked and

20        answered.  Go ahead.

21        A.   I did tell him he was under arrest.

22        Q.   Yeah, you didn't simultaneously, or you

23   didn't simultaneously reach your hand out to, you

24   know, to put your hand on him?

25        A.   Correct.  It was probably a half second or

Page 25

1    one second.

2              MR. BLANK:  Let's go ahead and just mark

3        this Use of Force as Exhibit -- which one are

4        we on?

5              COURT REPORTER:  Three.

6     (PLAINTIFF'S EXHIBIT 3 WAS MARKED FOR THE RECORD)

7        Q.    Okay.  And you have identified this as

8    General Order 1.3, Use of Force, correct?

9        A.    Yes, sir.

10       Q.    Okay.  Down at 13.1(a), can you just go

11   ahead and read that for the record?

12       A.    It is the policy of the Covington Police

13   Department that officers shall exhaust all other

14   reasonable means of achieving a lawful police

15   objective, including the application of

16   de-escalation techniques, before resorting to the

17   use of force.  The legitimate use of force,

18   including deadly and non-deadly measures, is limited

19   to only the amount reasonable and necessary under

20   the circumstances to achieve a lawful police

21   arrest -- objective.

22       Q.    Okay.  So they're talking again about

23   these de-escalation techniques.  As it applies to

24   the arrest with Alex Kallmeyer, what de-escalation

25   techniques did you employ?

Page 26

1          A.   I tried talking to him for the entire time

2    after I made contact with him before I used force,

3    trying to achieve a dialogue.  I had already called

4    for a second unit to come to my location so I was

5    trying to bide my time and wait for a second unit.

6    I had asked him to sit on the ground, which also

7    gauges compliance and makes it safer for when we go

8    to handcuff.  I gave him multiple opportunities.  I

9    told him he was under arrest.

10         Q.   You did tell him he was under arrest?

11         A.   Yes.

12         Q.   Did you do that -- you did that after he

13   took a step?

14         A.   Yes, sir.

15         Q.   Yeah.  First you told him to sit on --

16   from what I've read, and tell me if I'm wrong, first

17   you told him to sit on the curb, and he said no?

18         A.   Correct.

19         Q.   Okay.  And then he took a step, and you

20   said, you're under arrest and then you took action?

21         A.   Correct.

22         Q.   Okay.  You had already -- you had

23   contacted backup as soon as you -- well, when you

24   were in the car getting ready to -- before you went

25   out to confront Mr. Kallmeyer, correct; you called

Page 27

1    for backup?

2         A.   Yes, sir.

3         Q.   What was the call?  What do you say when

4    you call for backup in this situation?

5         A.   I would have said my unit number, which is

6    2 Charles 70.  I'll be getting out with one, West

7    11th and Madison.  Take one more car.

8         Q.   Do you know how long it was from the time

9    that you stepped out of the car to when you laid

10   your hands on Mr. Kallmeyer, how many seconds it

11   would have been?

12        A.   No, sir.

13        Q.   What's your estimate as to how long it

14   took before you had to arrest him?

15        A.   40 seconds.

16        Q.   Okay.  And the police arrived probably

17   within -- I mean, the other officers probably

18   arrived within 10, 15 seconds after you put your

19   hands on him?

20        A.   Yes, sir.

21        Q.   Okay.  Was Mr. Kallmeyer a risk to you at

22   the time that you put your hands on him?  Was he --

23   did he present a risk to you?

24        A.   I perceived a risk.

25        Q.   Okay.  And what was that risk?

Page 28

1      A.   I'm not sure what training he has, or what

2  weapons he has on him.  He forced me while I'm by

3  myself to put hands on him, and I don't know the

4  outcome that's going to come with that.

5      Q.   Okay.  He took a step away from you,

6  right?

7      A.   Around me.

8      Q.   Not towards you?

9      A.   Correct.

10     Q.   You were not concerned that he was taking

11  a fighting position, or ready to get aggressive with

12  you?

13     A.   Correct.

14     Q.   Okay.  He was not fleeing?

15     A.   I disagree.

16     Q.   You didn't write that in your report that

17  he was trying to flee?

18     A.   I used discretion on that.  If I wouldn't

19  have taken action he would have continued to walk

20  away from me.  It's not an --

21     Q.   Or you could have said stop, right?  You

22  could have said that?  Right?  When he took the

23  step, you could have said stop?

24     A.   I think I could have used the word stop.

25     Q.   Yeah, you didn't do that, right?

Page 29

1        A.    Correct.

2        Q.    Within a second you put your hands on him,

3   correct?

4        A.    Correct.

5        Q.    And within another second he hit the car,

6   right?

7        A.    Correct.

8        Q.    Okay.  There was not a -- this was not a

9   crisis situation, would you agree with that?

10        A.    Define crisis for me.

11        Q.    I don't know.  It's in your book.  What is

12   a crisis situation?

13        A.    As far as our policy, it would not be a

14   crisis situation.

15        Q.    What is a crisis situation, according to

16   your policy?

17        A.    Mental health.

18        Q.    Okay.  Did you have any concerns about his

19   mental health?

20        A.    At the time, no.

21        Q.    Your concern was he was intoxicated?

22        A.    Yes, sir.

23        Q.    And when you did put your hands on

24   Mr. Kallmeyer, you did not perceive that he had

25   slipped, or he had tripped or fell off the curb, or

Page 30

1    anything like that?

2        A.   I'm not sure.

3        Q.   Okay.  So he may have -- in your mind, he

4    may have tripped?  He may have slipped or --

5        A.   Yes, sir.

6        Q.   Yes?  Okay.  That's not in your report,

7    right?

8        A.   Correct.

9        Q.   You didn't warn him that you were going to

10   make physical contact with him, did you?

11       A.   No, sir.

12       Q.   You didn't warn him that if he took

13   another step that you would take physical action

14   with him, did you?

15       A.   No, sir.

16       Q.   You did not walk in front of him and try

17   to communicate with him about the fact that you were

18   going to arrest him?

19       A.   Correct.

20       Q.   Okay.  You didn't position yourself to try

21   to slow him down before you put your hands on him?

22       A.   Correct.

23       Q.   You didn't tell Mr. Kallmeyer to put his

24   hands behind his back?

25       A.   Correct.

Page 31

1      Q.    Why not?

2      A.    I didn't have time.

3      Q.    What was stopping you from doing that?

4      A.    The time I had.

5      Q.    And you'd agree with me that Kallmeyer was

6   not actively aggressive, according to your policies

7   and procedures?

8      A.    Yes, sir.

9      Q.    What does it mean to be actively

10  aggressive?  And there's a definition on the second

11  page there if you want to read that into the record.

12  And if that's consistent with what you're training

13  is that would be helpful, as well.

14     A.    Yes, sir.  Act of aggression means active,

15  hostile resistance by an individual culminating in a

16  threatened or actual attack upon the employee.

17     Q.    Okay.  And he wasn't showing those

18  behaviors, correct?

19     A.    Correct, sir.

20     Q.    Now, before you put your hands on him,

21  would you agree with me that he never actively

22  resisted before you laid your hands on him?

23     A.    As far as physical resistance, no.

24     Q.    Okay.  And then go ahead and read the

25  active resistance definition, so we have it in the

Page 32

1    record.

2        A.    Yes, sir.  Active resistance means an

3    individual is offering active physical resistance in

4    the form of pushing an officer, pulling away from an

5    officer, grappling with an officer or generally

6    offering physical resistance that is not an attack

7    upon the officer.

8        Q.    And so again, until such time as you put

9    your hands on him, he was not actively resisting.

10    You would say that when you put your hands on him,

11    he did actively resist?

12        A.    Yes, sir.

13        Q.    Okay.  And you're saying that he actively

14    resisted by pulling away?

15        A.    Yes, sir.

16        Q.    Okay.  So that would be within that

17    one-second period that you put your hands on him

18    before he hit the car?  He actively resisted within

19    that one second?

20        A.    Yes, sir.

21        Q.    Do you see that in the video, or it's just

22    not able to be seen?

23        A.    It's hard to tell from the video.

24        Q.    Okay.  And then the -- he went dead body

25    weight?  Am I describing that right?

Page 33

1        A.    Yes, sir.

2        Q.    Okay.  Tell me what that means in your

3    definition?

4        A.    That would be passive resistence.  Going

5    limp.

6        Q.    So why would he do that?  Why would

7    somebody do that in that situation?  Is that

8    something that happens from time to time?  What's

9    the benefit of doing that, in your mind?

10       A.    I'm not sure.

11       Q.    Okay.  You just felt like he went limp.

12   Did he go limp after he hit the car or before he hit

13   the car?

14       A.    It was around the same time.

15       Q.    Okay.  So you're not sure if it was before

16   or after?

17       A.    Correct.

18       Q.    Okay.  Let's go down to page 13, which is

19   3 of 28 of the General Order 1.3.  And if you could

20   just read the factor at the bottom there, number 2,

21   factors that should be considered.  Do you see that

22   down there?

23       A.    You're on page 3 of 28?

24       Q.    Yes, sir.  And number 2 there.

25       A.    Yes, sir.  Factors that should be

Page 34

1  considered when employing physical force include but

2  are not limited to:  Officer versus subject; age,

3  sex, size, skill level, number of subjects, etc.

4  Did you want B read also?

5      Q.  Yes.

6      A.  Special circumstances:  Closeness of

7  weapons, injuries sustained, or physical

8  exhaustion -- sorry, mine's really faded.  Being on

9  the ground, distance from the subject, level of

10 intoxication, special knowledge, availability of

11 other options, et cetera.

12     Q.  Okay.  So let's go through some of these

13 then.  Officer versus the subject age, sex, size,

14 skill level.  Those factors would be on a very low

15 level of a risk, you versus Mr. Kallmeyer, would you

16 agree with that?

17     A.  Not all of them.

18     Q.  Okay.  Which ones do you not agree with?

19     A.  At the time, the skill level.  I don't

20 know what his training --

21     Q.  Okay.  Fair enough.

22          Number of subjects would be very low on

23 the factor level because it was just you and him?

24 There wasn't multiple people hanging around,

25 correct?

Page 35

1          A.    Yes, sir.

2          Q.    Special circumstances, there was no

3    closeness to a weapon that you knew of, correct?

4          A.    Correct.

5          Q.    And you didn't suspect him, really.  I

6    know you always have to suspect somebody has a gun,

7    I suspect, but you didn't suspect him of having a

8    gun; is that fair?

9          A.    Not necessarily.

10         Q.    Okay.  Were you concerned about that when

11   you made the decision to use force?

12         A.    I was.

13         Q.    Okay.  Were you exhausted?

14         A.    No, sir.

15         Q.    Okay.  Were you concerned about his level

16   of intoxication?

17         A.    Yes, sir.

18         Q.    I mean, to the extent that it affected

19   your reason for using force?  It seems to me if

20   somebody is intoxicated, you know, if he was it

21   would be, you know, less of a reason to use force

22   because he's less of a threat because he's so

23   intoxicated.  I mean, is that fair?

24         A.    No, sir.

25         Q.    Okay.  Tell me about that then?

Page 36

1      A.    High level of intoxication could mean less

2  predictability, less chance of being able to

3  verbally persuade somebody.  A lot of times

4  intoxicants make you more violent.

5      Q.    Okay.  So you agree that whatever force an

6  officer takes to make the arrest, it has to be

7  reasonable, correct?

8      A.    Yes, sir.

9      Q.    And it has to be limited to the amount of

10 force necessary to make the arrest, correct?

11     A.    Yes, sir.

12     Q.    And do you feel like that's exactly what

13 you did in this situation?

14     A.    I do.

15     Q.    Okay.  Does the policy of the -- of

16 Covington mandate any specific verbal warnings or

17 commands before using force on a suspect?

18     A.    Not -- no, it doesn't -- it's not a shall.

19     Q.    What is it?

20     A.    I believe if you have the opportunity to

21 let them know the reason -- or let them know that

22 they are under arrest.

23     Q.    So on page 21 of 28.

24          MR. MANDO:  Bates stamp 31?

25          MR. BLANK:  Yes, sir.

Page 37

```
 1       Q.   And just try to refresh your recollection
 2  if you know, and you may not know this, but the
 3  reporting of use of force reports.  If you want to
 4  read one and two.  You don't have to read it out
 5  loud, read it to yourself.
 6       A.   Subsection A?
 7       Q.   Right down here.  It's with regard to the
 8  reporting.
 9       A.   Okay.
10       Q.   See if you can tell me anything about
11  that.
12       A.   I read it.  Can you narrow your question
13  down, please?
14       Q.   Yeah.  So it looks like they -- would you
15  agree with me that according to this use of force
16  report review, 1.3.15, that the Covington -- the
17  chief of police is to keep statistics on the use of
18  force reports of its officers?
19       A.   Yes, sir, it appears so.
20       Q.   Okay.  And they're supposed to compare the
21  years and the use of force reports per year for each
22  officer; would you agree with that?
23       A.   I'm not sure if it's for each officer or
24  if it's an individual trend for the department based
25  off of reading that.
```

Page 38

1      Q.   In any event, you are -- were you not

2  aware of that until you read this policy?

3      A.   Once I read this policy, I remembered I

4  was aware of this, but it slipped my mind.

5      Q.   Have you ever seen the statistics?  Have

6  they ever addressed it with you?  Addressed the

7  statistics with you?

8      A.   No, it's never been addressed with me.

9      Q.   And have you ever seen a report on it?

10     A.   I have.

11     Q.   Okay.  Have you seen one on you?  Not that

12  you've read it, but do they have one?

13     A.   No, sir.

14     Q.   Where have you seen that?

15     A.   On Power DMS.

16     Q.   What's Power DMS?

17     A.   I'm not much of a computer guy.  It's our

18  online file drive where reports and things like

19  that --

20     Q.   Okay.

21     A.   -- policies and forms that we use are

22  kept.

23     Q.   Okay.  And then the reports are on there

24  as to use of force?

25     A.   Yes.

Page 39

1      Q.    Okay.

2            MR. BLANK:  Jeff, I'm going to put that

3      in writing, but we will request that for 2022

4      and 2023.

5            MR. MANDO:  All right.

6      Q.    So do you recall having any meetings with

7      the chief of police with regard to your statistics?

8      A.    No, sir.

9      Q.    Okay.  It's never been brought to your

10     attention that you have an excessive amount of use

11     of force over other officers?

12     A.    No, sir.

13           MR. BLANK:  Let's go ahead and mark this.

14     (PLAINTIFF'S EXHIBIT 4 WAS MARKED FOR THE RECORD)

15     Q.    This is a KACO policy on response to

16     resistance.  Is this a document that you're familiar

17     with at all?

18     A.    No, sir.

19     Q.    Okay.  Read into the record the policy

20     which is Roman numeral II.  Go ahead and read it out

21     loud.  Here, read this one.

22     A.    Thank you.  Policy to protect and serve

23     all citizens while at the same time respecting the

24     rights of suspects and balancing the need for

25     officer safety in response to resistance events.  It

Page 40

1    is the policy of this department that

2    deputies/officers will use de-escalation skills,

3    techniques, and tactics in all law enforcement

4    operations where doing so does not compromise the

5    safety of officers, other persons, or where there is

6    a danger of significant property damage, and to use

7    only reasonable force to bring an incident or event

8    under control.  Reasonable force is the force

9    deployed to accomplish lawful objectives.  All

10   responses to resistance must be objectively

11   reasonable.  The agency and all officers recognize

12   that the sanctity of human life serves as the

13   guiding principle in responses to resistance

14   decisions.

15        Q.   Do you agree with that policy, whether or

16   not it's something that you've reviewed or not?

17        A.   I don't believe I reviewed it.

18        Q.   Okay.  I mean, what you just read, is that

19   consistent with what your policy is?

20        A.   Yes, sir.

21        Q.   Okay.  Is excessive force tolerated by the

22   City of Covington?

23        A.   No, sir.

24        Q.   Okay.  They make that pretty clear to you?

25        A.   Yes, sir.

Page 41

1    (PLAINTIFF'S EXHIBIT 5 WAS MARKED FOR THE RECORD)

2        Q.    Let's just run through --

3        A.    Thank you.

4        Q.    That's Exhibit 5, and you can identify

5    that as your responses to discovery.  Does that look

6    familiar to you?

7        A.    Yes, sir.

8        Q.    Okay.  Request, number 3, it says admit

9    that you believe that plaintiff was temporarily

10   knocked unconscious after he struck the police

11   cruiser before he came to, and was stood up with

12   assistance from officers, and you denied that?

13       A.    Correct.

14       Q.    Why did you deny that?

15       A.    I don't believe he was unconscious.

16       Q.    You never did?

17       A.    Correct.

18       Q.    Okay.  So you don't recall him being

19   knocked unconscious and then coming to?

20            MR. MANDO:  Objection.  Form.  Go ahead.

21       A.    Correct.

22       Q.    Did you ever tell anybody that, though,

23   that he was knocked unconscious and he came to?

24       A.    Initially, when he first went to the

25   ground, I called for an ambulance.  I assumed he was

Page 42

1    unconscious, but after flipping him over he was

2    immediately awake, and on his behalf, after that, I

3    don't believe he was ever unconscious.

4         Q.   But you told people that, that he was?

5         A.   I don't recall.

6         Q.   You wouldn't have said it unless you

7    thought it though, right?  You wouldn't tell

8    somebody that he was unconscious, unless you

9    believed it?  You wouldn't have lied about that?

10        A.   Correct.

11        Q.   Okay.  Request 4, so with regard to number

12   4, you failed to admit that Mr. Kallmeyer did not

13   use force or threaten the use of force against you

14   during the arrest.  Can you explain that?

15        A.   Number 4?

16        Q.   Yeah.

17        A.   He did use force.  He actively resisted

18   me.  It wasn't active aggression, but he was

19   actively resisting.

20        Q.   So, within the second that you touched his

21   back, and the second that he hit the car, that

22   one-second period, he did use force during that

23   period?  That's what you're talking about?

24        A.   Yes, sir.

25        Q.   Okay.  Number 6, and we probably already

Page 43

1    talked about this.  How do you -- let's see --

2    strike that.  We'll move on.  We've already handled

3    some of these, so I'm going to keep going.

4              Now, it's my understanding that you denied

5    causing physical injury to the plaintiff during the

6    use of force on the plaintiff during the arrest; is

7    that correct?

8         A.   Correct.

9         Q.   What's your explanation for that denial?

10        A.   I don't think the force that I used

11   against him caused any injury.

12        Q.   How do you define physical injury?

13        A.   Any pain, or lasting mark.

14        Q.   Okay.  So if he was knocked unconscious,

15   would you consider that a physical injury?

16        A.   I would.

17        Q.   But he wasn't?  That's your testimony,

18   right?

19        A.   I don't believe he was.

20        Q.   Okay.  If he suffered bruising would you

21   constitute that as a physical injury?

22        A.   I would.

23        Q.   You would?

24        A.   Yes, sir.

25        Q.   Okay.  If his body caused denting to a

Page 44

1   vehicle would you anticipate that that would cause

2   pain?

3        A.   Not necessarily.

4        Q.   So you don't accept that the dent from his

5   body into the car caused him any pain at all?  You

6   don't accept that?

7        A.   Correct.

8        Q.   So did you make another call after

9   Mr. Kallmeyer was laying on the ground after you

10  cuffed him?  Did you call to report an injury?

11       A.   I think I did prior to putting the

12  handcuffs on.

13       Q.   Okay.  When you were standing over him?

14       A.   Yes, sir.

15       Q.   Okay.  Did you put the handcuffs on or did

16  the other officer?

17       A.   I did.

18       Q.   Okay.  What did you say, as best you can

19  recall, when you called that in?

20       A.   I think I called for a supervisor and a

21  squad, meaning ambulance.

22       Q.   Okay.  Did you say anything about what his

23  injuries might be?

24       A.   No, sir.

25       Q.   Who was the officer that brought him to

1   jail?

2        A.    I believe it was Officer Crank.

3        Q.    How do you spell that?

4        A.    C-R-A-N-K.

5        Q.    Did you have any discussion with Officer

6   Crank about his injuries?

7        A.    I don't believe so.

8        Q.    Did any of your supervisors have any

9   constructive criticism of you about this incident?

10        A.    I don't believe so.

11        Q.    Nobody said anything negative to you about

12   it?

13        A.    No, sir.

14        Q.    Let's see, number 13, I think it was the

15   interrogatory.  Okay.  Yeah.  I asked in request for

16   admission 13, admit that you could have activated

17   your audio on the body-worn camera when you

18   confronted plaintiff but did not, and you denied

19   that?

20        A.    Correct.

21        Q.    Okay.  You say defendant believed his

22   body-worn camera and audio were activated as he

23   approached the plaintiff; is that right?

24        A.    Yes, sir.

25        Q.    So my question was, you could have

Page 46

1    activated your -- you could have activated it, but

2    you did not?

3         A.   I believed I had.

4         Q.   Yeah, but you didn't?

5         A.   Correct.

6         Q.   Okay.  So that, you could admit that

7    question if you read --

8              MR. MANDO:  Objection.  Form.

9         Q.   Okay.  Let's read it again.  Admit that

10   you could have activated your audio on the body-worn

11   camera when you confronted plaintiff, but you did

12   not, that's true, right?

13             MR. MANDO:  Objection.  Form.  Go ahead.

14        A.   Yes.

15        Q.   Okay.  And so the next one is, admit that

16   your failure to activate your audio on your

17   body-worn camera when you confronted plaintiff was

18   against the Covington police policy regarding the

19   use of body-worn camera and audio devices.  Do you

20   stand by that denial, and if so, why?

21        A.   Yes, technically failure to activate it

22   would be against our policies.

23        Q.   Okay.  So how do you activate the camera

24   with the audio?  How does this generally happen?

25   And I'm talking about the body-worn camera.

Page 47

1        A.    There's several ways.  You can --

2        Q.    Do you -- you don't have yours on?

3        A.    No, sir.  I haven't been in yet today.

4   You can double tap it.

5        Q.    Okay.

6        A.    Or the lights in your cruiser can activate

7   it.

8        Q.    Tell me about the lights in the cruiser

9   first.

10       A.    There's some sort of high-tech stuff in

11  there.  When you turn your lights on it activates

12  your body camera.

13       Q.    Okay.

14       A.    Your overhead lights.

15       Q.    It activates your body-worn camera?

16       A.    Yes, sir.

17       Q.    Didn't know that.  Okay.  So when you

18  turned your lights on, it would have activated it?

19       A.    Correct.

20       Q.    But it doesn't necessarily activate the

21  sound?

22       A.    It would.

23       Q.    It would?

24       A.    Yes, sir.

25       Q.    Okay.  Why didn't it?

Page 48

1      A.    When I got out of my car I believed I

2  turned my lights all the way on.  My thumb

3  short-stroked it and I only turned on my rear

4  lights.  And it has -- there's three different

5  toggle positions.  It has to go to the third to

6  active your camera.

7      Q.    And then you can also -- you can also turn

8  it on with your hand?

9      A.    Yes, sir.

10     Q.    How do you do that?

11     A.    By tapping it twice.

12     Q.    Okay.  And that's just tapping your chest?

13     A.    Yes, sir.  It's the -- I don't have mine

14  on.  It's the front facing.

15     Q.    And you didn't do that when you approached

16  him?

17     A.    Correct.

18   (PLAINTIFF'S EXHIBIT 6 WAS MARKED FOR THE RECORD)

19     Q.    And can you identify this policy that I

20  put in front of you?

21     A.    It's our body-worn video recording policy.

22           MR. BLANK:  Hold on a minute.

23           MR. MANDO:  Yours or is this --

24           THE WITNESS:  No, this is KLC's.

25           MR. BLANK:  Okay.  Yeah, I've already

Page 49

1      marked it.

2  BY MR. BLANK:

3      Q.   So this is not your policy, correct, that

4  I've handed you?

5      A.   Correct.

6      Q.   But you do have a policy with regard to

7  video recording, correct?

8      A.   We do, sir.

9      Q.   Okay.  Well, you're aware of what that

10  policy is; is that correct?

11      A.   Yes, sir.

12      Q.   You've kind of identified that when you

13  make contact with a citizen, your audio and your

14  camera are supposed to be active, correct?

15      A.   Yes, sir.

16      Q.   And they're supposed to remain active

17  until such time as your communication with that

18  person is over?

19      A.   Correct.

20      Q.   Okay.  What is the policy in discussing

21  the matter with other officers on the scene?  I see

22  a lot of times they'll turn it off and turn it on.

23  In fact, in this case that happened a lot.  What is

24  the policy on that?

25      A.   You can mute your body camera if you're

Page 50

1  talking to a supervisor, you're away from the

2  citizen that you're out with, you're talking with

3  another officer.

4      Q.   Okay.  If you're talking with an officer

5  regarding the investigation of the case, still, is

6  it okay to turn that -- turn the audio off?

7      A.   Yes, sir.

8      Q.   Is that written down within the policy?

9      A.   I'm not 100 percent sure.

10     Q.   Because this was a use of force

11 investigation at the scene, wasn't it?  Was this a

12 use of force investigation when they came out, and

13 they took pictures of you, and they took pictures of

14 Mr. Kallmeyer and they were interviewing you,

15 correct?

16     A.   I wouldn't call it an interview.  It's

17 just my sergeant asked for a quick rundown of what

18 happened.

19     Q.   Okay.  And why did you turn your audio

20 off?  Why didn't you leave it on?

21     A.   That's our standard operating procedure

22 when you're talking to a supervisor after use of

23 force.

24     Q.   And is that within the policy, or is it

25 just something that you guys generally do?

Page 51

1        A.   We generally do it.  I can't remember if

2   it's in the policy verbatim.

3            MR. BLANK:   Okay.  Exhibit 7.

4   (PLAINTIFF'S EXHIBIT 7 WAS MARKED FOR THE RECORD)

5        Q.   Just for the record, we've already talked

6   about this, but the field recording device and

7   system standards, which is GO 40.01, is this the

8   policy of the City of Covington?

9        A.   Yes, sir, this is it.

10       Q.   Okay.  And this is the policy that we were

11   referring to and talking about?

12       A.   Yes, sir.

13       Q.   That's all I have on that one.  Let me see

14   where I'm at here.

15   (PLAINTIFF'S EXHIBIT 8 WAS MARKED FOR THE RECORD)

16       Q.   Can you identify Exhibit 8 for the record?

17       A.   Yes, sir.  It's a Use of Force Report.

18       Q.   Okay.  And would you have completed this

19   document?  Would you have completed this document

20   with the exception of the last page?

21       A.   Yes, sir.

22       Q.   Okay.  And for the record, can you just

23   identify and describe when this Use of Force Report

24   is mandated by the Covington Police Department?

25       A.   I believe it's before your shift ends.

Page 52

1          Q.   Okay.  So this has to be completed before

2    your shift ends?

3          A.   Yes, sir.

4          Q.   And would you have done that in this case?

5          A.   Yes.

6          Q.   And can you identify, I know it obviously

7    occurs when there is a use of force, but what's the

8    parameter of that use of force?  Is it any time you

9    touch somebody, or does there have to be an injury,

10   or what are the parameters of when a Use of Force

11   Report has to be completed?

12         A.   It's any time force is needed to put

13   somebody in handcuffs other than a standard

14   handcuffing technique or an injury being received

15   due to, like, incidental contact.

16         Q.   Okay.  Is it any time that there's an

17   injury?  Does there have to be an injury?

18         A.   No, sir.

19         Q.   Let's go down to the bottom of it.  And

20   there's levels of resistance by suspect.  You have

21   checked not responding to commands, and I think

22   we've already talked about that.  Verbal defiance,

23   what was his verbal defiance?

24         A.   When I told him he was under arrest and he

25   replied, no, I'm not.  When I asked him to sit on

Page 53

1    the curb, and he did not do so.

2        Q.   Okay.  And we talked about the dead weight

3    already, correct?

4        A.   Yes, sir.

5        Q.   And we haven't really talked about the

6    pulling away.  So let's kind of -- let's go through

7    it.

8             MR. BLANK:  I'm going to show him the

9        video.

10            MR. MANDO:  Uh-huh.

11       Q.   And when you're looking at the video, I

12   want to you to kind of pay attention to the time in

13   the top left corner -- or top right where it tells

14   you the times.

15       A.   Yes, sir.

16       Q.   Because there's only -- it's only about

17   five or six seconds that we're really going to be

18   going through.  And we might have to, you know,

19   reverse it a couple times.

20            Let's just, we're going to start it at --

21   so on the top right where we're starting to look at

22   this, it is at 18 -- what is that 46?

23       A.   Yes, sir.

24       Q.   Okay.  So you got out of the car there.

25   This is 1857 now.  Would you say around 1855, give

Page 54

1    or take a couple seconds --

2          A.    Yes, sir.

3          Q.    -- is that fair?  Okay.  And you're

4    already with him within a couple, few seconds; is

5    that fair?

6          A.    Yes, sir.

7          Q.    So at 1857 you're confronting him.  He's

8    walking towards you towards your cruiser?

9          A.    Yes, sir.

10          Q.    And so to the left behind us, that is

11    what?

12          A.    That's the cathedral.

13          Q.    That's the cathedral.  What's this

14    building here to his right, do you know?

15          A.    Some sort of building related to the

16    cathedral.

17          Q.    Okay.  In any event, it's at the corner of

18    11th and Madison, correct?

19          A.    Yes, sir.

20          Q.    Okay.  And he's walking toward the river,

21    north?

22          A.    Correct.

23          Q.    And now you're talking to him.  So what's

24    your first question to him?  What are we doing

25    here?

Page 55

1        A.   I identified myself, who I was, and I had

2   him take his hands out of his pockets.

3        Q.   Yeah.

4        A.   He tried to -- looked like he tried to

5   step around me.  I kind of moved in front of him.

6   And I started off by asking him about the

7   altercation that I had observed, or the end of the

8   altercation a block away.

9        Q.   Okay.  So let's talk about that, when did

10   you first see him?

11        A.   I was going eastbound on 12th in the right

12   lane, cresting the viaduct.

13        Q.   So you're going east, which is towards the

14   railroad tracks?

15             MR. MANDO:  No.

16        Q.   That's west.

17        A.   Towards Newport.

18        Q.   Towards Newport.  Okay.  Did you come over

19   the bridge?

20        A.   I did.

21        Q.   Okay.  And that's where you first saw him?

22        A.   Yes, sir.

23        Q.   Okay.  And what did you see?

24        A.   The first thing that caught my eye was I

25   could hear yelling.  And then I saw Mr. Kallmeyer,

Page 56

1    and there was another subject on a bicycle and they

2    were yelling.  And that's what I first saw.

3          Q.    Okay.  So you didn't see any physical

4    contact between these two, you just heard them

5    talking, or yelling whatever?

6          A.    Yes, sir.

7          Q.    One or the other.  Okay.  And then you

8    didn't stop, correct?

9          A.    Not initially.

10          Q.    Okay.  Why didn't you stop at that point?

11          A.    I was almost to the light by the time I

12    saw him, making a right turn.

13          Q.    You were making a right turn?

14          A.    To go south on Madison.

15          Q.    But if you're stopped at that 11th and

16    Madison --

17                MR. MANDO:  12th and Madison.

18          Q.    -- 12th and Madison, isn't that where they

19    were?

20          A.    They were.

21          Q.    Okay.  Why didn't you just stop?

22          A.    I was watching them for a second to try to

23    figure out what exactly was going on.

24          Q.    Okay.  It wasn't a situation that required

25    a police officer at that point, at least in your

Page 57

1    mind?

2         A.    Not immediately.

3         Q.    Okay.  But you wanted to keep an eye on

4    them?

5         A.    Uh-huh.

6         Q.    So what did you do?

7         A.    I flipped my cruiser around, so I turned

8    south on Madison.  And then in the 1200 block I

9    flipped around.

10        Q.    Okay.

11        A.    And at that point there was another

12   subject on a bicycle, and I couldn't see him

13   anymore.

14        Q.    Okay.  And so then you came back when he

15   was walking towards you?  He was walking south and

16   you were coming from -- he was walking north and you

17   were coming from north?

18        A.    No, sir.  I was south of him when I

19   flipped around.  So I was facing north.  As he was

20   walking north I was behind him.

21        Q.    Okay.  All right.  Yeah, I've gotcha.  And

22   what then caused you to want to stop him?

23        A.    The way he was walking it appeared he was

24   extremely intoxicated.

25        Q.    Was there anybody else around him at that

Page 58

1    point?

2         A.   No, sir.

3         Q.   Okay.  There weren't a lot of cars either,

4    would you agree with that?

5         A.   I can't remember.

6         Q.   Okay.  So you were asking him about the

7    situation with the other gentleman?

8         A.   Yes, sir.

9         Q.   Okay.  Did you tell him that he looked

10   intoxicated?  Or did you tell him that he looked

11   like he was on drugs?

12        A.   No, I believe I asked him how much he had

13   to drink, but I can't recall exactly verbatim.

14        Q.   Yeah.  So mainly you were asking about

15   what that other situation was, and you're assessing

16   his level of intoxication; is that fair?

17        A.   Initially, yes, sir.

18        Q.   Okay.  And you were telling him to show

19   his hands, or are you just telling him to keep them

20   out of your pocket?

21        A.   Yes, sir, keep them out of your pocket.

22        Q.   Okay.  And so now that's -- we're at 1919.

23   And he's showing his hands because he's now got them

24   out of his pocket, and he's got his arm within his

25   shirt, correct?

Page 59

1       A.    Yes, sir.

2       Q.    Okay.  So probably not specific about what

3  you were questioning at this point?  Probably the

4  same thing, is there anything else you wanted to add

5  to that?

6       A.    No, sir.

7       Q.    He puts his hands back in his pockets.

8  And then takes them back out.  And it's now 1921

9  when he took them back out, correct?

10       A.    I think it's a four, sir.

11       Q.    1924.  Okay.  And he's showing his hands

12  again, right?

13       A.    Yes.

14       Q.    And now he's pointing somewhere.  Do you

15  remember that situation?  You heard what he said?

16  Is it possible that you were asking where he was

17  going, and he was pointing to where he was going, or

18  do you remember?

19       A.    I believe I asked him where he lived.

20       Q.    Okay.

21       A.    And that's when he pointed.

22       Q.    Do you remember what he said?

23       A.    No.

24       Q.    Let me ask you this, to this point is he

25  cooperating or not?

Page 60

1          A.    I would say no.

2          Q.    Why wasn't he?  What was he doing not to

3    cooperate?

4          A.    I remember asking where he lived.  He

5    couldn't tell me, he was just pointing.  At this

6    point we're at three times now, I've had to ask him

7    to get his hands out of his pockets.

8          Q.    Okay.

9          A.    And I believe at that point -- sorry.

10         Q.    Go ahead.

11         A.    I had also asked him to sit on the ground

12   at that point.

13         Q.    Okay.  You have.  Okay.  Now, you heard

14   his testimony.  He said he asked you several times

15   why did you pull me over, words to that effect.

16   Would you agree with that, or not?  Was he asking

17   you that?

18         A.    I believe he asked me once.

19         Q.    Okay.  And what do you recall him asking

20   you?

21         A.    I told him for jaywalking at 12th and

22   Madison.

23         Q.    Okay.  Did you tell him to sit down right

24   before he took that step again?  I think we've

25   talked about this.

Page 61

1        A.    It was several seconds before.

2        Q.    And then he -- this is when he decides

3   that he is going to walk away?  Is that what you

4   perceived?

5        A.    Yes, sir.

6        Q.    Okay.  And is that 1942.  It looks like,

7   would you say, he took one step by that point?

8        A.    Yes, sir.

9        Q.    Let me just hit this real fast.  Okay.  So

10  it looks like you've got your hands on him between

11  1843 and 1844?

12       A.    19.  Yes, sir.

13       Q.    Thank you.  I didn't mean that.

14       Okay.  And so the first thing you do is --

15  why don't you explain to us what you're doing here.

16       A.    Yeah.  So the first thing I did was I

17  grabbed his right arm near his bicep.

18       Q.    With your right arm?

19       A.    With my right hand across from his elbow.

20  And I tried to reach across his back to also get his

21  left arm.

22       Q.    Okay.  Before you did that, when he took

23  the step, you told him he was under arrest, and he

24  took another step; is that --

25       A.    Yes, sir.

Page 62

1      Q.    -- how it happened?  Okay.

2            So did you tell him, because we can't see

3    your voice, and we can't hear it.  So it's 1844 when

4    you first touch him.  Are you kind of telling him

5    simultaneously when you're grabbing him or --

6            MR. MANDO:  Objection.  Asked and

7            answered.  You can answer it again.

8      A.    No, it was prior.

9      Q.    Okay.  So, on the timeline, when do you

10   think it would have been?  So it's -- is it just a

11   second or two prior to that?

12     A.    Probably 41, 40?

13     Q.    So maybe 1941?

14     A.    Yes, sir.

15     Q.    Okay.  But it was after he took his first

16   step?

17     A.    Yes, sir.

18     Q.    Okay.  Maybe we can figure that out then.

19   And he -- has he pulled away or done anything yet at

20   this point at 1944?

21     A.    Yes, sir.  It was pretty immediate.

22     Q.    Okay.  What's he doing?

23     A.    I could feel him tense up, try to pull his

24   right arm back towards his front, and he was

25   twisting his torso towards the left.

Page 63

1        Q.   So his right arm is going forward, and

2   he's twisting to the left?

3        A.   Yes, sir.

4        Q.   Okay.  And it looks like he's hitting the

5   car at about 1945 to 1946, right in there?

6        A.   Yes, sir.

7        Q.   Okay.  And he went deadweight about this

8   time, about 1946?

9        A.   I would say just prior.

10       Q.   So maybe before he hit the car, but you

11  can't say that?  You can't say that for sure?

12       A.   Correct.

13       Q.   Okay.  So when he was laying against the

14  car like that, did you perceive that he was

15  unconscious, potentially, at that time?

16       A.   At that time I did not.  I was telling him

17  to stand up.

18       Q.   Okay.  And then he's on the ground at,

19  say, 1952, give or take a second?

20       A.   Yes, sir.

21       Q.   And you don't perceive him as being

22  unconscious here?

23       A.   At the time I did.

24       Q.   Okay.  Is that you right there?  Are you

25  shaking him, or you're rubbing his chest?

Page 64

1      A.   Yes, sir.

2      Q.   And he responded?

3      A.   He did.

4      Q.   Okay.  Thank you.

5           MR. BLANK:  Hey, Jeff, you care if I take

6      ten minutes and then I think I'm going to

7      finish this up.

8           MR. MANDO:  Okay.

9                (OFF THE RECORD)

10   (PLAINTIFF'S EXHIBIT 9 WAS MARKED FOR THE RECORD)

11   BY MR. BLANK:

12     Q.   Okay.  Officer Mathews, I just have a few

13   more things, and then we'll get you out of here.

14   I've given you Exhibit 9 there.  It's an Intake

15   Assessment from the Kenton County Detention Center.

16   Have you ever seen a document like this before?

17     A.   I have not.

18     Q.   Okay.  And you've made 392 arrests in 2022

19   and you've never seen this document?  Do you know

20   what it is?

21     A.   I can assume from looking at it.

22     Q.   What do you think it is?

23     A.   Something that the jail deputies fill out.

24     Q.   Yeah, so have you ever gone to the jail

25   and they ask you -- read some of those just to

Page 65

1    yourself.  Have they asked you these questions ever

2    at the jail when you deliver someone?

3         A.   They've asked me before if they're

4    combative, but none of these.  It's usually what

5    they ask the arrestee.

6         Q.   Number three, it says has the arrestee

7    engaged in any assaultive or violent behavior, that

8    says no.  And you would agree with that or would

9    not?

10        A.   I would not agree with that.

11        Q.   Okay.  Are you aware, this is number 7,

12   are you aware of the arrestee's consumption or use

13   of potentially dangerous levels of alcohol and

14   drugs.  It says, no, would you agree with that?

15        A.   It would -- for me, would depend on the --

16   as far as the jail assessment goes, I would agree,

17   but I'm not a deputy.

18        Q.   Okay.  Five.  It says, has the arrestee

19   attempted to allude or escape custody?  And you said

20   no there.  Would you --

21             MR. MANDO:  Objection.  He didn't.  The

22        form says no.

23             MR. BLANK:  Correct.

24        Q.   I apologize.  Mr. Mando is correct, the

25   form says no.  Would you agree with that?

Page 66

1       A.   No.

2       Q.   Did you call down to the officer that

3   delivered Mr. Kallmeyer and ask to take -- ask him

4   to take pictures of his chest?

5       A.   I did not.

6       Q.   Who did that?

7       A.   Just from reviewing body camera, I believe

8   it was Sergeant Fain.

9       Q.   Wasn't Sergeant Fain the one that took him

10  down there?

11      A.   No.

12      Q.   I'm sorry.  Who took him down there?

13      A.   Officer Crank.

14      Q.   Oh, that's right.  Okay.  On the impact to

15  the car, you purposefully pushed Mr. Kallmeyer into

16  the car, correct?

17      A.   Yes, sir.

18      Q.   Okay.  And you used the appropriate amount

19  of force in your mind that you wanted to use?

20      A.   Yes, sir.

21      Q.   You don't think you did it too hard?

22      A.   Not at all.

23      Q.   No regrets?

24      A.   No, sir.

25      Q.   Any other options that you could have

Page 67

```
 1    employed that maybe you considered before shoving

 2    him into the car?

 3         A.    No, sir.

 4         Q.    You knew that backup was on the way?

 5         A.    Yes, sir.

 6         Q.    And you could hear the sirens when you

 7    were there pushing him into the car, correct?

 8         A.    No, sir.

 9         Q.    Why not?  Did they not have their sirens

10    on?

11         A.    I don't believe so.

12         Q.    Could you see the lights?

13         A.    No, sir.

14         Q.    Because they arrived within how many --

15    well, I'll ask you.  How many seconds did it take

16    after he hit the car for the police -- the other

17    police patrolmen to arrive?

18         A.    It was pretty quick, 15 seconds, maybe.

19         Q.    Yeah.  Why didn't you just restrain him?

20         A.    Can you elaborate?

21         Q.    Well, you came from kind of behind to the

22    side of him, right?  Kind of like an angle.  But why

23    couldn't you just grab him and say, stop?  Why did

24    you need to push him into the car?

25         A.    So why didn't I just give him a bear hug
```

Page 68

1    and stand there?

2        Q.    Yeah.

3        A.    That wouldn't be safe at all.  I don't

4    know his level of training.  I don't know his

5    weapons.  I don't know where my backup is coming

6    from.  They could be coming from Latonia for all I

7    know, so...

8        Q.    But he had less than, you know, maybe a

9    second if -- you know, obviously Mr. Kallmeyer

10   doesn't believe you said he was under arrest.  But

11   even if we assume that you said you are under

12   arrest, he had less than two seconds to even respond

13   to that before he hit the car?

14            MR. MANDO:  Objection.  Characterization.

15       Q.    Would you agree with that?

16       A.    I believe he had the entire time to be

17   compliant.  As far as you're under arrest, it was

18   probably two seconds.

19       Q.    And you never gave him any other options

20   like, hey, if you don't stop, I'm going to -- I'm

21   going to, you know, be physical with you?  You never

22   gave him any options, though, did you?

23       A.    Not after I told him he was under arrest.

24       Q.    But then you confronted him within a

25   second?

Page 69

1          MR. MANDO:  Objection.  Characterization.

2     Go ahead.

3     A.    Yes, sir.

4     Q.    You're under arrest, bam, into the car,

5  right?

6     A.    I wouldn't put it like that.

7     Q.    How would you put it?

8     A.    I wouldn't put it as bam, into the car.

9          MR. BLANK:  All right.  I'll stop right

10     there.  Thank you.

11          MR. MANDO:  I have no questions at this

12     point, but we will take signature, please.

13                              (Witness excused)

14  (The deposition ended at approximately 1:20 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 70

1

2                        SIGNATURE PAGE

3

4            I, Samuel Mathews, declare under penalty

5    of perjury that the foregoing is my deposition under

6    oath; that these are the questions asked of me and

7    my answers thereto; that I have read my deposition

8    and have made any necessary corrections, additions

9    or changes that I deem necessary.

10

11   Dated this _____ day of _____ 2024.

12

13

14

15                    _____

16                        Samuel Mathews

17

18

19

20

21

22

23

24

25

Page 71

1                                    )

2   COMMONWEALTH OF KENTUCKY  )

3                                    )

4

5            I, Tina M. Barlow, Commonwealth of

6   Kentucky, do hereby certify:

7        That the witness named in the deposition, prior

8   to being examined, was by me, first duly sworn;

9        That said deposition was taken before me at the

10  time and place therein set forth and was taken down

11  by me in shorthand and thereafter transcribed into

12  typewriting under my direction and supervision;

13       That said deposition is a true record of the

14  testimony given by the witness and of all objections

15  made at the time of the examination.

16       I further certify that I am neither counsel for

17  nor related to any party to said action, nor in any

18  way interested in the outcome thereof.

19       IN WITNESS WHEREOF I have subscribed my name

20  and affixed my seal this 16th day of November, 2024.

21

22

23                    TINA M. BARLOW
                      Notary Public
                      Notary ID KYNP60230
24                    My Commission expires: 11/6/26

25